## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TEXAS, *ex rel.* WILLIAM WALSH, <br><br> Plaintiffs, <br><br> v. <br><br> UNIVERSAL HEALTH SERVICES, INC., INDEPENDENCE PHYSICIAN MANAGEMENT LLC UHS OF TEXOMA, INC. D/B/A TEXOMA MEDICAL CENTER, TEXOMACARE, AND TEXOMACARE SPECIALTY PHYSICIANS, <br><br> Defendants. | Case No. <br><br> **FILED IN CAMERA AND UNDER SEAL** <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

On behalf of the United States of America ("United States"), State of Texas ("Texas") and himself, Relator William Walsh ("Relator") files this *qui tam* complaint against Universal Health Services, Inc., Independence Physician Management LLC, UHS of Texoma, Inc. d/b/a Texoma Medical Center, TexomaCare, and TexomaCare Specialty Physicians ("Defendants"), and alleges as follows:

## INTRODUCTION

1.     This is a civil action to recover damages and penalties on behalf of the United States arising from false claims and statements made, caused and/or presented by the Defendants in violation of the Federal False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*

2.    The FCA allows an individual known as a relator, or whistleblower, to file an action on behalf of the government for violations of the FCA and receive a portion of any recovery as an award to the *qui tam* plaintiff. 31 U.S.C. § 3730. Under the FCA, the Complaint must be filed under seal (without service on the defendants) to enable the government to conduct its own investigation without the defendants' knowledge and to allow the government an opportunity to intervene in the action.

3.    Defendants have violated the FCA by engaging in a scheme to improperly compensate and provide other remuneration to physicians and a physicians group in violation of the Stark Law and Anti-Kickback Statute. As a result of these Stark Law and Anti-Kickback Statute violations, Defendants submitted or caused to be submitted thousands of false claims to the Medicare and Medicaid programs, resulting in millions of dollars in improper reimbursement.

4.    Defendants have also violated the Texas Medicaid Fraud Prevention Act (TMFPA), Tex. Hum. Res. Code §§ 36.001 *et seq*. Like the FCA, the TMFPA allows a private citizen with information of fraud against the Texas Medicaid program to file a *qui tam* complaint on behalf of Texas and be awarded a percentage of any recovery.

## JURISDICTION AND VENUE

5.    Relator brings this action on behalf of himself and the United States pursuant to 31 U.S.C. § 3730(b)(1).

6.    This Court has subject matter jurisdiction over Plaintiffs' claims arising under the FCA, 31 U.S.C. § 3729 *et seq*., pursuant to 31 U.S.C. §3732(a) and

28 U.S.C. § 1331 and 1345. The Court has supplemental jurisdiction to entertain Relator's state law claims pursuant to 28 U.S.C. § 1367(a).

7.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, and/or have transacted business within the United States.

8.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a) because at least one Defendant resides in this district and because alleged violations of the FCA occurred in this district.

## DEFENDANTS

9.     Defendant Universal Health Services, Inc. ("UHS") is a large publicly traded corporation incorporated in Delaware with its headquarters located in King of Prussia, PA. UHS owns and operates numerous hospitals and other healthcare facilities throughout the United States. UHS purchased the Texoma Medical Center, TexomaCare, and other facilities that comprise the Texoma Medical Center healthcare system in early 2007.

10.     Defendant Independence Physician Management LLC ("IPM") is a Delaware limited liability company with its primary place of business located in King of Prussia, PA. IPM was created in 2012 by UHS and is a wholly owned subsidiary of UHS. The contracts with the physician groups owned by UHS, such as TexomaCare and TexomaCare Specialty Physicians, are held directly with IPM. However, employees from UHS, TMC, and IPM are responsible for determining, approving, and paying remuneration to TexomaCare, TexomaCare Specialty

Physicians, and the TexomaCare Physicians. Defendants UHS and IPM, while technically separate entities, operated as a single entity with employees from both companies being jointly responsible for the decisions regarding the management of the UHS-owned physician groups.

11.     Defendant UHS of Texoma, Inc. d/b/a Texoma Medical Center ("TMC"), is a Delaware corporation with its primary place of business located in Denison, Texas. TMC owns and operates a healthcare system in northeast Texas, which includes a 288-bed acute care hospital located in Denison, Texas (Texoma Medical Center), as well as satellite facilities located in Sherman, Texas and the surrounding areas. Other facilities owned and operated by defendant TMC include the TMC Restorative Care Hospital and the Texoma Behavioral Health Center. UHS of Texoma, Inc. owns defendants TexomaCare and TexomaCare Specialty Physicians and is a wholly owned subsidiary of defendant UHS.

12.     Defendant TexomaCare is a Texas corporation with its primary place of business in Denison, Texas. TexomaCare is a physicians group that is owned and operated by TMC. TexomaCare employs approximately fifty physicians and has clinic locations in Bonham, Denison, Durant, Madill, Pottsboro, Sherman, Van Alstyne, and Whitesboro, Texas.

13.     Defendant TexomaCare Specialty Physicians is a Texas corporation with its primary place of business in Denison, Texas. TexomaCare Specialty Physicians is physician group and a subsidiary of defendant UHS. TexomaCare

Specialty Physicians employs approximately six cardiologists who perform a high volume of procedures at TMC facilities.

## THE RELATOR

14.     The Relator, William Walsh, was employed by Defendant UHS as Director of Accounting from November 2013 until August 2015. Relator worked as a senior financial analyst for UHS from November 2012 through November 2013.

15.     As defined in 31 U.S.C. § 3730(e)(4)(B), Relator qualifies as the "original source" of the allegations made herein. Specifically, the violations alleged herein are based upon Relator's personal knowledge, expertise, and non-public documents made available to Relator during the course of his employment and communications with Defendants. Relator provided the information that forms the basis of the allegations made herein to the federal government prior to filing this Complaint.

## BACKGROUND

**A.     The Medicare Program**

16.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, established the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (or "Medicare").

17.     The United States, acting through the Department of Health and Human Services (HHS) and the Centers for Medicare & Medicaid Services (CMS), administers the Medicare Program.

18.     Entitlement to Medicare is based on age, disability or affliction with

end-stage renal disease. See 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B primarily covers physician and other ancillary services. See 42 U.S.C. § 1395k.

19.     CMS contracts with private Medicare Administrative Contractors (MACs) to process and pay Part A and Part B claims and perform administrative functions on a regional level. See 42 § C.F.R. 421.5(b). The current Medicare Parts A and B MAC for Texas is Novitas Solutions, Inc.

20.     Healthcare facilities, such as hospitals, that elect to enroll in Medicare Part A must periodically submit an application to participate in the program. The application, which must be signed by an authorized representative of the provider, contains a certification that the provider agrees that Medicare payments are conditioned upon compliance with the Federal Anti-Kickback Statute, the Stark Law and all applicable Medicare conditions of participation.

21.     After the end of each hospital's fiscal year, every hospital must submit a cost report to its fiscal intermediary or MAC, stating the amount of Part A reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; *see also* 42 C.F.R. § 405.1801(b)(1).

22.     Every hospital cost report contains a certification, signed by the chief administrator of the provider or a responsible designee, stating that the services identified in this cost report were provided in compliance federal laws and regulations, including those alleged to have been violated in this Complaint.

23.     Defendant TMC submitted, and the United States relied upon, the statements contained in TMC's applications and cost reports. These statements were material to the hospital's eligibility to receive payments from the Medicare program.

### B.     The Texas Medicaid Program

24.     Title XIX of the Social Security Act, commonly referred to as the Medicaid, was enacted in 1965 as a cooperative undertaking between the federal and state governments to help the states provide medical care to lower income individuals. 42 U.S.C. § 1396 *et seq*. Medicaid is funded jointly by the federal and state governments. Each state administers its own Medicaid program with oversight from CMS.

25.     Texas Medicaid reimburses providers for healthcare services provided to eligible individuals, including inpatient and outpatient hospital care.

26.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§ 1396 et seq.

27.     In order to qualify for FFP, each state's Medicaid program must meet certain minimum requirements, including the provision of hospital services to Medicaid beneficiaries. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

28.     To submit claims to and receive reimbursement from the Texas Medicaid Program, providers must apply to enroll in the Texas Medicaid Program, agree to a provider agreement, and submit periodic reports and recertification documents, all of which attest to the provider's compliance with state and federal

law.

### C.    The Stark Law

29.    The Stark Law, 42 U.S.C. §1395nn, *et seq.*, prohibits the referral from a physician to a provider for "designated health services" (DHS) where the referring physician has an impermissible "financial relationship" with the DHS provider. 42 U.S.C. § 1395nn(a)(1), (h)(6). The Stark Law provides that the DHS provider shall not cause to be presented a Medicare or Medicaid claim for items or services arising from prohibited referrals; payment of claims for services rendered in violation of the Stark Law is also prohibited. 42 U.S.C. § 1395nn(a)(I), (g).

30.    A "financial relationship" includes a direct or indirect investment or ownership interest, as well as a compensation arrangement whereby any remuneration is paid directly or indirectly to a referring physician by the DHS provider.

31.    DHS include inpatient and outpatient hospital procedures, laboratory testing, imaging, and other services. *See* Section 1877(h)(6) of the Social Security Act; 42 C.F.R. § 411.351.

32.    "Referrals" as used in this Complaint includes referrals for healthcare services, including designated health services. Referrals include physician orders, prescriptions, referrals to other practitioners, and the inpatient and facility charges associated with healthcare services performed by a physician and paid to a healthcare facility or other provider, such as a hospital.

33.    The  Stark  Law  and  companion  regulations  contain  numerous

exceptions that may apply to different types of financial relationships. Potential exceptions are available, for example, for arrangements that meet the requirements for "bona fide employment relationships," "personal service arrangements," "fair market value arrangements," and "indirect compensation relationships," to name a few. 42 U.S.C § 1395nn(h)(1) and 42 C.F.R. § 411.355-57.

34.     There are two common requirements for each of these exceptions: the remuneration paid to the physician must not exceed fair market value and must not take into account the value or volume of referrals made to the DHS provider. *See* 42 C.F.R. § 411.354.

35.     A claim submitted to Medicare or Medicaid in knowing violation of the Stark Law is a violation of the FCA

**D.     The Anti-Kickback Statute**

36.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits the knowing offer or payment of any remuneration in exchange for referrals for a healthcare service for which payment is made by any federally funded healthcare program, including Medicare, Medicaid, and TRICARE.

37.     Specifically, the Anti-Kickback Statute prohibits providers, such as hospitals, from paying remuneration to a referral source, such as a physician or physician group, where one purpose of the compensation is to induce referrals for healthcare services paid for by the federal healthcare programs.

38.     The Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the

statute. 42 U.S.C. § 1320a-7b(b)(3).

39.     A violation of the Anti-Kickback Statute is a violation of the federal False Claims Act.

### E.     The Texas Medicaid Fraud Prevention Act and Anti-Kickback Laws

40.     The TMFPA and Texas Human Resource Code § 32.039 combine to prohibit the offer, payment or receipt, directly or indirectly, of any remuneration to induce another person to refer, order, furnish or recommend an item or service for which payment may be made, in whole or in part, from the Texas Medicaid Program.

41.     In addition, Texas Administrative Code § 371.1669 prohibits a physician from referring a Medicaid patient to an entity with which the physician has a financial relationship.

42.     Compliance with the Texas Medicaid Fraud Prevention Act and federal healthcare laws are a condition of payment for claims submitted to the Texas Medicaid Program.

## DEFENDANTS' MISCONDUCT

43.     In 2007, UHS purchased the Texoma Medical Center and a multi-specialty physicians' group that provides medical care for patients of the Texoma Medical Center healthcare system. As a condition of the purchase, UHS agreed to build a new larger hospital within three years of the purchase.

44.     In order to ensure that the referrals, inpatient admissions, facility fees, and other business generated by the TexomaCare physicians go to Texoma Medical Center, UHS has improperly subsidized and paid above fair market value

compensation to TexomaCare and the TexomaCare physicians.

45.     Defendants knowingly violated the Stark Law because UHS made payments and provided other remuneration to a physicians' group (TexomaCare) and the physicians employed by TexomaCare (the "TexomaCare Physicians") in a manner that violated the Stark Law. Despite knowing of this improper financial relationship, Defendants knowingly violated the FCA by submitting claims for designated health services to the Medicare and Medicaid programs, which constituted prohibited referrals under the Stark Law.

46.     Defendants knowingly violated the Anti-Kickback Statute and Texas laws prohibiting healthcare kickbacks because Defendant UHS, through its subsidiary, Defendant IPM, paid remuneration to TexomaCare and the physicians employed by TexomaCare and one purpose of this compensation was to induce or encourage referrals for medical services covered by the federal healthcare programs, including Medicare, Medicaid, and TRICARE. Defendants further violated the FCA by knowingly submitting claims the federal healthcare programs that were induced or tainted by remuneration offered or paid in violation of the Anti-Kickback Statute.

47.     As a result of Defendants' violations of the Stark Law and Anti-Kickback Statute, Defendants also violated the TMFPA by submitting claims for reimbursement to the Texas Medicaid program that were generated from referrals made by TexomaCare and the TexomaCare Physicians.

**A.      TexomaCare Physicians' Compensation Agreements**

48.     Each physician employed by TexomaCare entered into a contract with

TexomaCare, which set for the terms of the physician's compensation. The TexomaCare Physicians' total compensation included a base salary and an incentive compensation component.

49.    The TexomaCare Physicians' base salary was fixed at a pre-agreed amount for the initial contract year. After the initial contract year, each physician's base salary would be increased by an amount equal to fifty to ninety percent of any increase in the physician's professional production over the preceding year. This annual salary increase was subject to TexomaCare's profitability and at the "sole discretion" of TexomaCare. The physicians' professional production was defined as actual collections of fees for the physicians' professional services, net of refunds, excluding any collections for ancillary services. A drop of more than five percent in the physician's production compared with the six-month month period in the prior year could also result in a salary decrease at TexomaCare's option.

50.    The incentive compensation portion of each TexomaCare Physicians' compensation is equal to the physicians "allocable share" of TexomaCare's net income. Net income was defined as net collections for the cost center or "POD" to which the physician was assigned, including all professional fees and ancillary services, less total operating expenses as determined by TexomaCare. If the physicians' POD generated net income at the end of the fiscal year, the physicians were entitled to incentive compensation equal to 100 percent of the physician's allocable share, calculated as the number of patient visits for that physician divided by the total patient visits for the physician's POD. A patient visit is defined as an

ambulatory encounter where the patient is seen by the physician.

51.     Notwithstanding this compensation methodology, each physician's aggregate compensation was not to exceed the maximum total compensation determined by the UHS of Texoma Board of Directors for the physician's specialty unless waived by the UHS of Texoma Board of Directors.

52.     All compensation decisions made by TexomaCare were subject, as set forth in the TexomaCare Physicians' contracts, to approval by the Board of Directors of UHS of Texoma, Inc.

53.     As a condition of employment, each of the TexomaCare Physicians was required by their employment contract to provide medical services exclusively to TexomaCare patients at "facilities utilized by TexomaCare, or such other location in the Practice Territory as TexomaCare determines."

### B.     Excessive Compensation of TexomaCare Physicians

54.     Defendants UHS and IPM determined the accounting methods used to determine the salary adjustments and incentive compensation paid to the TexomaCare Physicians. In an effort to ensure that the TexomaCare Physicians would continue to make referrals to and perform procedures at TMC, UHS and IPM made commercially unreasonable accounting decisions that caused the TexomaCare physicians to be paid salary and incentives in excess of fair-market value and the profits generated by TexomaCare. There are three types of operating expenses that were improperly ignored by Defendants in calculating the TexomaCare Physicians' compensation: (1) employee benefit expenses; (2) hospital management services; and

(3) billing and claims administration costs.

### 1.   Employee Benefit Expenses

55.   First, UHS and IPM decided that employee benefit expenses incurred by TexomaCare employees would not be included as operating expenses in calculating the surplus or profit earned by each physician POD. For fiscal year 2014, the unallocated employee benefit expense was $1.6 million. Failing to include this expense in the TexomaCare profit distribution calculation inflated the incentive payments made to the TexomaCare Physicians for fiscal year 2014 by approximately $1.6 million.

56.   Relator raised concerns regarding this failure to allocate employee benefit expenses in a July 2014 email to the vice president of IPM. The vice president of IPM rejected Relator's concerns and directed Relator and other employees of UHS, IPM, and TMC to continue excluding employee benefit costs from operating expenses because IPM vice president had already promised to keep the calculation the "same" as it had been in prior years. The director of finance for UHS's acute hospital care business and the market manager for TMC were both copied on this email chain. The surplus payments to the TexomaCare Physicians were processed and paid by TMC.

57.   The intentional refusal of UHS and IPM to include employee benefit expenses as operating expenses to the TexomaCare Physicians also improperly inflates the net income of each individual TexomaCare physician, which resulted in unwarranted salary increases in subsequent years where the physician's

professional productivity also increased over the previously year.

58.     UHS and IPM failed to include TexomaCare's employee benefit expenses as operating costs for 2012 through 2015 and, on information and belief, for every year since UHS purchased TMC and TexomaCare in January 2007. As a result, UHS and IPM paid improper remuneration to TexomaCare each year beginning in 2007, which caused the TexomaCare physicians to be paid compensation in excess of fair market value and in amounts greater than the amounts described in the TexomaCare Physicians' employment agreements.

### 2.     Hospital Management Services

59.     In addition to ignoring employee benefit expenses, Defendants UHS and IPM opted not to include any of the fees paid by TexomaCare to TMC for hospital management services as operating expenses. In 2014, this resulted in approximately $142,000 in inflated profits that were improperly disbursed to the TexomaCare physicians. UHS and IPM failed to include or allocate the fees for hospital management services as operating expenses in fiscal year 2013 as well. On information and belief, UHS and IPM improperly excluded TexomaCare's hospital management service fees from operating expenses in each year since UHS purchased TMC and TexomaCare in January 2007.

60.     Like the failure to allocate TexomaCare's employee benefit expenses, Defendants UHS' and IPM's decision to ignore hospital management services as an operating expense improperly inflated the salary adjustments and surplus compensation payments paid to the TexomaCare Physicians in 2012 through 2014

and, on information and belief, in each year since UHS acquired TMC and TexomaCare (from 2007 through the present).

### 3.   Billing and Claims Administration Costs

61.   Last, Defendants UHS and IPM undercharged TexomaCare for billing and claims administration. Again, this artificially lowered the operating expenses used to calculate the TexomaCare Physicians' incentive payments and salary adjustments. The $619,000 in billing fees allocated to TexomaCare's operating expenses in 2014 is far below fair market value for the billing and claims administration services utilized by TexomaCare in generating $23.1 million in patient care revenue in 2014. This also means that UHS, TMC, and IPM provided billing services to TexomaCare and the TexomaCare Physicians for which TexomaCare paid less than fair market value.

62.   Ignoring or under allocating these three categories of operating expenses incurred by TexomaCare was only made possible because of the decisions made by UHS and IPM to knowingly and illegally subsidize TexomaCare and over-compensate the TexomaCare Physicians. UHS, IPM, and TMC knowingly ignored or under allocated these operating expenses in order to encourage and reward TexomaCare and the TexomaCare Physicians for making referrals to TMC. The subsidies paid to and losses incurred by TexomaCare were allowed in order to generate additional referrals and patient volume at TMC.

63.   For 2012, 2013, and 2014, UHS and IPM caused TexomaCare to make profit distribution or "surplus" payments to the TexomaCare Physicians in the

amounts of approximately $1.6 million, $1.6 million, and $1.3 million, respectively.

64.     The surplus or profit sharing payments from TexomaCare to the individual TexomaCare Physicians for 2012 through 2014 are set forth in **Exhibit 2** hereto.

65.     Defendants UHS, IPM, and TMC made or caused to made excessive and improper payments to the TexomaCare physicians in order to maintain high patient and procedure volumes at TMC and ensure that the TexomaCare Physicians continued to make referrals and generate other business from TMC.

66.     Based on Defendants' failure to properly allocate operating expenses in determining the TexomaCare Physicians' salary and incentive compensation, TexomaCare operates a significant unsustainable loss. For 2013 and 2014, TexomaCare had operating losses of $4 million and $2.8 million, respectively. Including intercompany transfers of $2.1 million and $1.9 million for 2013 and 2014, respectively, this means that TexomaCare was generating losses of $6.3 million and $5 million, respectively. These losses were effectively subsidies to TexomaCare and the TexomaCare Physicians that resulted in excessive, commercially unreasonable, and above fair-market compensation in violation of the Stark Law, Anti-Kickback Statute and related Texas laws.

67.     Despite Defendants having access to these financial statements showing operating losses by TexomaCare and virtually all of the individual TexomaCare Physicians, Defendants chose to use a separate methodology and calculation to artificially show operating profits to justify excessive and unwarranted

compensation to the TexomaCare Physicians. For example in 2013 and 2014, Dr. Lipscomb, a pediatrician, showed a $105,000 and $54,000 operating loss on UHS' income statements, but was indicated as having a $93,000 and $163,000 operating profit for the same years according to Defendants' incentive compensation or "surplus" calculations. These arbitrary and improper accounting methods resulted in Dr. Lipscomb being paid $829,000 in 2014, which is more than 230% of the 90th percentile compensation for pediatricians according to the industry-accepted Medical Group Management Association ("MGMA") physician compensation survey for 2013.

68.    The accounting policies that resulted in the TexomaCare losses and unwarranted compensation to the TexomaCare Physicians were determined in part by the Director of Treasury Operations for UHS of Delaware, Inc., a subsidiary of UHS. Management level employees of all Defendants specifically reviewed and approved the surplus methodology and payments made to the TexomaCare Physicians described in **Exhibit 2.**

69.    UHS and IPM own and manage numerous other physician groups throughout the United States. Defendants also knew that the accounting methods used to compensate the TexomaCare Physicians were improper because they made an effort to include the three categories of operating expenses (employee benefits, hospital-provided services, and billing costs) in calculating the profit and compensation of most other physicians groups.

70.    Effective control over TexomaCare's finances, including budget, compensation, and salaries, was not maintained by a centralized decision-making

body representative of the group practice. Although TexomaCare has a board of directors, the majority of whom are physicians, the board does not maintain effective control over the group's financial decisions. Rather, effective control over TexomaCare's assets and liabilities is maintained by IPM and UHS employees located at UHS's headquarters in King of Prussia, PA.

### C.   Heritage Park Surgical Hospital Arrangements

71.   Heritage Park Surgical Hospital ("Heritage Park") is a partially-physician-owned hospital located in Sherman, Texas. Heritage Park is located about three miles from Texoma Medical Center and competes with TMC for patient volume. Heritage Park opened in 2010.

72.   TMC and Heritage Park entered into several agreements. This included an investment by TMC in Heritage Park in 2010 where by TMC invested $3.6 million in Heritage Park. In addition, TMC made a loan to Heritage Park on or around September 29, 2010 for $2.3 million with an annual interest rate of 3.25%.

73.   In early 2015, TMC and UHS attempted to purchase Heritage Park. In anticipation of this pending acquisition, UHS and IPM informed the TexomaCare Physicians of the possible sale and encouraged the TexomaCare Physicians to purchase interests in Heritage Park.

74.   However, after several TexomaCare Physicians had purchased interests in Heritage Park, Heritage Park decided to partner with another healthcare system. This resulted in Baylor Scott and White Health and United Surgical Partners purchasing a 20% stake in Heritage Park. As a result, TMC and

UHS encouraged the TexomaCare Physicians to divest their interests in Heritage Park due to its competing interest with TMC and UHS.

75.     The transactions between Defendants and Heritage Park, as well as Defendants recommendation to the TexomaCare Physicians to purchase shares in Heritage Park resulted in improper compensation to the TexomaCare Physicians who purchased interests in Heritage Park. On information and belief, this included Drs. Lipscomb and Tran, two of the highest-paid physicians identified in **Exhibit 1**. Upon the sale of Heritage Park, Foundations Healthcare, another investor in Heritage Park issued a press release boasting that "[w]e believe our experience with Heritage Park Surgical Hospital demonstrates the value of partnering with Foundation HealthCare. Our physician partners at Heritage Park received $6.3 million in distributions or about $78,750 per 1% ownership interest during the five years following the opening of the hospital, in May 2010, through the sale in June 2015. In addition to these distributions, an initial investment of $25,000 resulted in a return of more than $230,000 from the sale of both the operations and real estate units. That represents a total return on investment of over 900% in five years not including the monthly distributions."

### D.     False Claims to Medicare, Medicaid, and other Government Healthcare Programs

76.     Because Defendant TMC owns TexomaCare, there exists a financial relationship between TMC and the TexomaCare Physicians, who receive compensation from TexomaCare.

77.     As described in paragraphs 43 through 73, the compensation paid to

the TexomaCare Physicians failed to comply with the exceptions set forth by the U.S. Secretary of Health and Human Services under the Stark Law.

78.     As a result, from 2007 through the present, TMC was prohibited by the Stark Law from billing for, and the TexomaCare Physicians were prohibited from making, referrals for designated health services paid for by Medicare or Medicaid.

79.     TMC submitted millions of dollars in prohibited claims to the Medicare and Texas Medicaid claims knowing that these claims were explicitly not eligible for payment because they were derived from referrals from the TexomaCare Physicians that were prohibited by the Stark Law.

80.     In addition, beginning in 2007, UHS, TMC, and IPM provided remuneration to TexomaCare in the form of subsidies and credit that allowed TexomaCare to calculate and distribute excessive and commercially unreasonable levels of "profit" to the TexomaCare Physicians. One purpose of this remuneration, described in paragraphs 43 through 73, was to induce, encourage and reward TexomaCare and the TexomaCare Physicians for referrals made to TMC. This conduct violated the Anti-Kickback Statute.

81.     As a result, from 2007 through the present, TMC was prohibited from billing for all claims for healthcare services paid for by federally-funded healthcare programs, including Medicare, Medicaid and TRICARE, that were derived from referrals or otherwise generated by the TexomaCare Physicians.

82.     Despite knowing that the claims described in the preceding paragraph were explicitly not eligible for reimbursement, TMC submitted millions of dollars in

prohibited claims to Medicare, Medicaid, TRICARE, and other federally-funded healthcare programs.

83.     As a small sample of these false claims, **Exhibit 3** identifies procedures that were performed by TexomaCare Physicians in 2013 and 2014 and billed to Medicare. The vast majority of these procedures were performed in a TMC facility. For each of these procedures, TMC submitted claims for and received reimbursement for facility or technical component fees or inpatient reimbursement from Medicare. These facility claims are considered referrals for the purposes of the Stark Law and Anti-Kickback Statute and Defendants violate the FCA by presenting or causing these claims to be presented to Medicare.

84.     Furthermore, healthcare facilities such as TMC, must submit annual cost reports and other documents to the HHS certifying that they are compliant with the federal healthcare laws, including the Stark Law and Anti-Kickback Statute. Their certifications were knowingly false and material to the United States' and Texas' payment of false claims to the Defendants.

### E.     TexomaCare Specialty Physicians

85.     In addition to the TexomaCare group, UHS and TMC also own an affiliated physician group, TexomaCare Specialty Physicians.

86.     TexomaCare Specialty Physicians employs two groups of cardiologists, Texoma Heart Group and Texoma Cardiovascular Care Associates. Texoma Heart Group was acquired by TexomaCare in 2015 while UHS has owned Texoma Cardiovascular Care Associates since it acquired TMC in 2007.

87.    The six cardiologists employed by TexomaCare Specialty Physicians each perform a high volume of procedures at TMC facilities, a large portion of which are paid for by the Medicare and Texas Medicaid Programs.

88.    On information and belief, the compensation paid to the physicians employed by TexomaCare Specialty Physicians, as well as the remuneration paid to by UHS, TMC, and/or IPM to TexomaCare Specialty Physicians, is also above fair market value.

89.    On information and belief, one purpose of the remuneration paid by UHS, TMC, and/or IPM to TexomaCare Specialty Physicians was to induce referrals for healthcare services to TMC that were paid for by the federal healthcare programs.

## COUNT I:    PRESENTMENT OF CLAIMS IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(A))

90.    Relator re-alleges and incorporates by reference the allegations contained in paragraphs 43 through 88 as if fully stated in this Count.

91.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

92.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented to the United States Government false or fraudulent claims.

93.    Such claims were false or fraudulent because the Defendants falsely submitted the claims in violation of the Stark Law and the Anti-Kickback Statute

and certified that claims were eligible for payment when payment was explicitly and implicitly prohibited.

94.     The United States, unaware of the falsity of the claims made by the Defendants, paid Defendants for claims that would otherwise not have been allowed.

95.     By knowingly failing to comply with requirements upon which payment was contingent, each claim presented or caused to be presented by Defendants was false.

96.     By knowingly, willfully or recklessly presenting, or causing other to present, false claims for payment to the United States, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), to the damage of the Treasury of the United States, by causing the United States to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendant has engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

97.     As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

98.     Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

99.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

## COUNT II:  FALSE STATEMENTS IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(B))

100.    Relator re-alleges and incorporates by reference the allegations contained in paragraphs 43 through 88 as if fully stated in this Count.

101.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

102.    By virtue of the acts described above, Defendants made, used, and caused to be made and used, false records and statements that were material and caused or contributed to improper payments of federal funding to Defendants. Specifically, Defendants knowingly expressly and impliedly certified that the Medicare, Texas Medicaid, TRICARE, and other federal healthcare program claims described herein were not prohibited by the Stark Law and/or Anti-Kickback Statute when they were not eligible for payment.

103.    The United States, unaware of the falsity of the records and statements, paid Defendants for claims that would otherwise not have been allowed.

104.    Payment by the United States for all Medicare, Medicaid and other claims submitted by Defendants was conditioned upon Defendants' compliance with the laws and regulations described herein.

105.   By knowingly, willfully or recklessly making, or causing others to make, false statements and certifications material to the United States' decision to pay on false claims, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), to the damage of the Treasury of the United States , by causing the United States to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

106.   As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly false claims that it would not otherwise have paid.

107.   Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

108.   Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

## COUNT III:  RETENTION OF OVERPAYMENTS IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(G))

109.   Relator re-alleges and incorporates by reference the allegations contained in paragraphs 43 through 88 as if fully stated in this Count.

110.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

111.   By virtue of the acts described above, Defendants have knowingly concealed and/or knowingly and improperly avoided an obligation to transmit money to the federal government. Specifically, Defendants knew or should have known that they received millions of dollars in payments from Medicare, Medicaid, TRICARE and other federal healthcare programs for claims that were prohibited by the Stark Law and/or Anti-Kickback Statute.

112.   Once known, even if the improper payments were not fixed or clearly defined, Defendants had an obligation to remit or report such funds to the government within sixty (60) days. 42 C.F.R. § 401.305. Defendants have not reported or returned the improper payments described herein.

113.   By knowingly concealing and/or knowingly and improperly avoiding its obligation to transmit money recovered to the federal government, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), to the damage of the Treasury of the United States, by causing the United States to be deprived of funds that rightfully belong to the government.

114.   As a direct and proximate result of Defendants' fraudulent and/or illegal actions and fraudulent conduct, the United States has been deprived of funds to which it is lawfully entitled and which were improperly paid to Defendants.

115.   Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

116.   Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five-thousand five-hundred to eleven-thousand dollars

($5,500 - $11,000).

## COUNT IV: <u>VIOLATIONS OF THE TEXAS MEDICAID FRAUD PREVENTION ACT</u>

117.   Relator re-alleges and incorporates by reference the allegations contained in paragraphs 43 through 88 as if fully stated in this Count.

118.   Defendants knowingly violated the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.002, Texas Human Resource Code § 32.039, and Texas Administrative Code § 371.1669 by offering, paying, or receiving, directly or indirectly, remuneration to induce another person to refer, order, furnish or recommend an item or service for which payment may be made, in whole or in part, from the Texas Medicaid Program.

119.   For the improperly induced items or services, Defendants submitted or caused to be submitted false claims to, and received reimbursement from, the Texas Medicaid Program.

120.   Defendants also knew or should have known about the improper payments they received from the Texas Medicaid Program but failed to report or return the improper payments.

121.   Defendants expressly and impliedly certified that they were in compliance with the Texas Medicaid Fraud Prevention Act, Stark Laws, and Anti-Kickback Statute when they knew or should have known that they were not. These false statements were material to false claims that defendants submitted to the Texas Medicaid Program.

28

122.   As a result, Defendants are liable for three times the full value (state and federal share) of every claim paid by the Texas Medicaid Program as a result of the improper referrals generated by the physicians described herein, plus statutory penalties as provided under Texas law.

WHEREFORE, Relator requests that judgment be entered against Defendants, ordering that:

a.   Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

b.   Defendants cease and desist from violating the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.001, *et seq.*;

b.   Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

d.   Defendants pay not less than $5,500 and not more than $15,000 for each violation of Tex. Hum. Res. Code § 36.001 *et seq.*, plus three times the amount of damages the Texas Medicaid Program has sustained because of Defendants' actions;

c.   Relator is awarded the maximum amounts allowed pursuant to 31 U.S.C. § 3730(d) and Tex. Hum. Res. Code § 36.110;

d.   Relator is awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and Tex. Hum. Res. Code § 36.110;

e.      Defendants are enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

f.      Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

g.      Defendants pay prejudgment interest on all damages and disgorgements to maximum extent provided under state and federal law, including as provided in Tex. Hum. Res. Code § 36.052(2); and

h.      The United States, Texas, and Relator recover such other relief as the Court deems just and proper.

## JURY DEMAND

A trial by jury is hereby demanded.

Dated: March 31, 2016

LEVY KONIGSBERG LLP

By:

John Paul Guinan (#78580)
*jguinan@levylaw.com*
Alan J. Konigsberg
(seeking admission *pro hac vice*)
*akonigsberg@levylaw.com*
Brendan E. Little
(seeking admission *pro hac vice*)
*blittle@levylaw.com*
800 Third Ave., 11th Floor
New York, NY 10022
Phone:   (212) 605-6200
Fax: (212) 605-6290

*Attorneys for the Relator*

# EXHIBIT 1

## Exhibit 1 - TexomaCare Physicians

| Last Name | First Name | |
|---|---|---|
| Balch | Bill | MD |
| Boothe Jr. | Thomas | MD |
| Brumit | Timothy | MD |
| Carlson | Duke | MD |
| Church | Robert | MD |
| Felicitas | Patrick | MD |
| Flaming | Daniel | MD |
| Gonzalez | Ignacio | MD |
| Goodwin-Chambers | Shannon | MD |
| Haislip | Heidi | MD |
| Hatt | Jeannie | MD |
| Hayes | David | MD |
| Hayes | Shannon | MD |
| Hermann | Jeffrey | MD |
| Hui | Mei | MD |
| Jones | Christopher | MD |
| Kahl | Bryan | MD |
| Kalil | Bryan | MD |
| Khoury | Stephen | DO |
| Kislingbury | Todd | DO |
| Landrum | Marilyn | MD |
| Latham | Angela | MD |
| Lipscomb | Joe | MD |
| Massenburg | Bryan | MD |
| Muniz | Manuel | MD |
| Nabors | Venus | MD |
| Nguyen | Nhat | MD |
| Ohnes-Verduguez | Vanessa | MD |
| Parker | James | MD |
| Potter | Joe | MD |
| Restrepo | Diego | MD |
| Saltz | Richard | MD |
| Sanders | Robert | MD |
| Saunders | John | MD |
| Schreiber | Lee | MD |
| Sisk | Dana | MD |
| Tarpley | Jim | DO |
| Thornton | Stacey | MD |
| Tran | Tung | MD |
| Trowbridge | Molly | MD |

| Truly | Ted | MD |
| Watkins | Mackey | MD |
| Whitfield | Larry | MD |

# EXHIBIT 2

**Exhibit 2 - TexomaCare Physician Compensation**

| Last Name | First Name | 2012 Salary | 2012 Bonus | 2013 Salary | 2013 Bonus | 2014 Salary | 2014 Bonus |
|---|---|---|---|---|---|---|---|
| Balch | Bill | $245,503 | $51,573 | $228,465 | $31,447 | $227,550 | $49,033 |
| Boothe Jr. | Thomas | $0 | $0 | $0 | $0 | $245,000 | $0 |
| Brumit | Timothy | $431,786 | $42,461 | $464,407 | $53,316 | $473,881 | $90,800 |
| Carlson | Duke | $271,861 | $69,054 | $263,815 | $30,254 | $274,368 | $33,246 |
| Church | Robert | $234,861 | $66,182 | $236,513 | $31,067 | $246,961 | $33,631 |
| Felicitas | Patrick | $0 | $0 | $53,365 | $0 | $185,559 | $6,439 |
| Flaming | Daniel | $0 | $0 | $54,808 | $0 | $190,000 | $0 |
| Gonzalez | Ignacio | $343,606 | $63,693 | $331,896 | $36,113 | $330,305 | $70,252 |
| Goodwin-Chambers | Shannon | $307,616 | $77,304 | $295,785 | $37,975 | $309,769 | $42,892 |
| Haislip | Heidi | $183,000 | $0 | $134,770 | $0 | $133,934 | $27,497 |
| Hatt | Jeannie | $139,566 | $24,053 | $144,586 | $30,141 | $145,975 | $57,424 |
| Hayes | David | $129,954 | $34,676 | $133,564 | $47,518 | $150,559 | $87,592 |
| Hayes | Shannon | $83,368 | $18,711 | $98,049 | $25,607 | $141,138 | $47,662 |
| Hermann | Jeffrey | $173,500 | $1,747 | $174,728 | $31,337 | $3,696 | $0 |
| Hui | Mei | $186,610 | $59,516 | $195,684 | $30,608 | $227,387 | $32,171 |
| Kahl | Bryan | $265,251 | $45,490 | $265,032 | $24,333 | $281,144 | $48,132 |
| Kalil | Bryan | $348,416 | $39,224 | $380,407 | $55,132 | $404,396 | $93,727 |
| Kislingbury | Todd | $31,731 | $0 | $144,231 | $12,414 | $151,617 | $27,708 |
| Landrum | Marilyn | $275,336 | $66,073 | $272,442 | $30,595 | $287,422 | $32,156 |
| Latham | Angela | $253,356 | $70,693 | $257,792 | $35,970 | $296,899 | $40,130 |
| Lipscomb | Joe | $521,123 | $51,575 | $591,156 | $75,653 | $687,420 | $141,346 |
| Massenburg | Bryan | $168,426 | $0 | $163,303 | $0 | $173,711 | $0 |
| Muniz | Manuel | $0 | $0 | $134,615 | $0 | $58,461 | $0 |
| Nabors | Venus | $250,000 | $0 | $211,154 | $0 | $150,000 | $26,583 |
| Nguyen | Nhat | $0 | $0 | $0 | $0 | $184,615 | $0 |
| Ohnes-Verduguez | Vanessa | $156,923 | $0 | $192,308 | $0 | $201,560 | $0 |
| Parker | James | $212,125 | $3,079 | $213,547 | $42,885 | $206,722 | $33,657 |
| Potter | Joe | $184,690 | $62,903 | $177,587 | $27,842 | $188,064 | $29,481 |
| Restrepo | Diego | $116,692 | $0 | $186,538 | $0 | $212,147 | $25,578 |
| Saltz | Richard | $525,000 | $5,653 | $504,808 | $48,643 | $525,000 | $29,981 |
| Sanders | Robert | $424,255 | $45,742 | $284,870 | $25,621 | $273,779 | $46,234 |
| Saunders | John | $134,215 | $0 | $126,225 | $0 | $105,953 | $0 |
| Schreiber | Lee | $324,026 | $83,225 | $334,933 | $36,651 | $351,895 | $39,962 |
| Sisk | Dana | $160,509 | $56,021 | $162,599 | $26,151 | $172,586 | $25,040 |
| Tarpley | Jim | $234,933 | $66,209 | $232,792 | $32,063 | $239,776 | $0 |
| Thornton | Stacey | $0 | $0 | $0 | $0 | $570,000 | $0 |
| Tran | Tung | $546,307 | $172,630 | $574,158 | $190,753 | $671,786 | $222,446 |
| Trowbridge | Molly | $0 | $0 | $0 | $0 | $53,365 | $0 |
| Truly | Ted | $275,351 | $71,838 | $265,886 | $45,188 | $287,894 | $71,901 |
| Watkins | Mackey | $230,461 | $0 | $117,077 | $15,401 | $146,485 | $46,341 |
| Whitfield | Larry | $222,431 | $51,963 | $218,532 | $30,116 | $233,435 | $48,559 |
| **Bonus Totals** | | | **$1,401,288** | | **$1,140,794** | | **$1,607,600** |

# EXHIBIT 3a

Exhibit 3a - 2012 TexomaCare Medicare facility claims

| Last Name | First Name | Procedure Code | Description of Procedure | Claims |
|---|---|---|---|---|
| BALCH | BILL | 99222 | Initial hospital inpatient care, typically 50 minutes per day | 38 |
| BALCH | BILL | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 140 |
| BALCH | BILL | 99233 | Subsequent hospital inpatient care, typically 35 minutes per day | 51 |
| BALCH | BILL | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 22 |
| BOOTHE | THOMAS | 57282 | Vaginal repair of pelvic ligaments | 12 |
| FALCONER | RALPH | 99284 | Emergency department visit, problem of high severity | 15 |
| GONZALEZ | IGNACIO | 99222 | Initial hospital inpatient care, typically 50 minutes per day | 80 |
| GONZALEZ | IGNACIO | 99238 | Hospital discharge day management, 30 minutes or less | 129 |
| GONZALEZ | IGNACIO | 99233 | Subsequent hospital inpatient care, typically 35 minutes per day | 21 |
| GONZALEZ | IGNACIO | 99217 | Hospital observation care discharge | 32 |
| GONZALEZ | IGNACIO | 99231 | Subsequent hospital inpatient care, typically 15 minutes per day | 113 |
| GONZALEZ | IGNACIO | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 417 |
| GONZALEZ | IGNACIO | 99219 | Hospital observation care typically 50 minutes | 32 |
| GOODWIN CHAMBERS | SHANNON | 99220 | Hospital observation care typically 70 minutes | 21 |
| GOODWIN CHAMBERS | SHANNON | 99217 | Hospital observation care discharge | 20 |
| GOODWIN CHAMBERS | SHANNON | 99231 | Subsequent hospital inpatient care, typically 15 minutes per day | 149 |
| GOODWIN CHAMBERS | SHANNON | 99238 | Hospital discharge day management, 30 minutes or less | 30 |
| GOODWIN CHAMBERS | SHANNON | 99239 | Hospital discharge day management, more than 30 minutes | 28 |
| GOODWIN CHAMBERS | SHANNON | 93010 | Routine EKG using at least 12 leads with interpretation and report | 27 |
| GOODWIN CHAMBERS | SHANNON | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 65 |
| GOODWIN CHAMBERS | SHANNON | 99308 | Subsequent nursing facility visit, typically 15 minutes per day | 56 |
| HAISLIP | HEIDI | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 35 |
| HAISLIP | HEIDI | 99231 | Subsequent hospital inpatient care, typically 15 minutes per day | 58 |
| HAISLIP | HEIDI | 99238 | Hospital discharge day management, 30 minutes or less | 43 |
| HAISLIP | HEIDI | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 55 |
| HUI | MEI | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 14 |
| KAHL | BRYAN | 79005 | Oral administration of radioactive material therapy agent | 17 |
| KAHL | BRYAN | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 38 |
| NGUYEN | NHAT | 99233 | Subsequent hospital inpatient care, typically 35 minutes per day | 33 |
| NGUYEN | NHAT | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 89 |
| NGUYEN | NHAT | 99238 | Hospital discharge day management, 30 minutes or less | 14 |
| NGUYEN | NHAT | 99231 | Subsequent hospital inpatient care, typically 15 minutes per day | 14 |
| NGUYEN | NHAT | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 14 |
| OHNES-VERDUGUEZ | VANESSA | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 27 |
| OHNES-VERDUGUEZ | VANESSA | 99233 | Subsequent hospital inpatient care, typically 35 minutes per day | 56 |
| POTTER | JOE | 99220 | Hospital observation care typically 70 minutes | 11 |
| POTTER | JOE | 99238 | Hospital discharge day management, 30 minutes or less | 105 |

| | | | | |
|---|---|---|---|---|
| POTTER | JOE | 99231 | Subsequent hospital inpatient care, typically 15 minutes per day | 258 |
| POTTER | JOE | 99308 | Subsequent nursing facility visit, typically 15 minutes per day | 80 |
| POTTER | JOE | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 112 |
| POTTER | JOE | 99217 | Hospital observation care discharge | 16 |
| SALTZ | RICHARD | 43262 | Incision of pancreatic outlet muscle using an endoscope | 17 |
| SALTZ | RICHARD | 45380 | Biopsy of large bowel using an endoscope | 215 |
| SALTZ | RICHARD | 91110 | Administration of oral capsule for evaluation using an endoscope | 19 |
| SALTZ | RICHARD | G0121 | Colorectal cancer screening; colonoscopy (non-high risk) | 16 |
| SALTZ | RICHARD | 45383 | Removal of growths in large bowel using an endoscope | 20 |
| SALTZ | RICHARD | 45381 | Injection of large bowel using an endoscope | 35 |
| SALTZ | RICHARD | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 427 |
| SALTZ | RICHARD | 99233 | Subsequent hospital inpatient care, typically 35 minutes per day | 198 |
| SALTZ | RICHARD | 43235 | Diagnostic examination of stomach and upper upper small bowel using an endoscope | 40 |
| SALTZ | RICHARD | 43236 | Injection of esophagus, stomach, and upper small bowel using an endoscope | 12 |
| SALTZ | RICHARD | 43255 | Control of bleeding of esophagus, stomach, or upper small bowel using an endoscope | 43 |
| SALTZ | RICHARD | 43239 | Biopsy of the esophagus, stomach, or upper small bowel using an endoscope | 220 |
| SALTZ | RICHARD | 45385 | Removal of polyps or growths of large bowel using an endoscope | 91 |
| SALTZ | RICHARD | 43246 | Insertion of stomach tube using an endoscope | 17 |
| SALTZ | RICHARD | 99222 | Initial hospital inpatient care, typically 50 minutes per day | 36 |
| SALTZ | RICHARD | 43450 | Dilation of esophagus | 12 |
| SALTZ | RICHARD | 45378 | Diagnostic examination of large bowel using an endoscope | 37 |
| SALTZ | RICHARD | 43249 | Balloon dilation of esophagus using an endoscope | 16 |
| SALTZ | RICHARD | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 223 |
| SALTZ | RICHARD | 43244 | Tying of dilated veins of stomach or esophagus using an endoscope | 18 |
| SHORT | PATRICIA | 93010 | Routine electrocardiogram (EKG) using at least 12 leads with interpretation and report | 17 |
| SHORT | PATRICIA | 99285 | Emergency department visit, problem with significant threat to life or function | 70 |
| SHORT | PATRICIA | 99283 | Emergency department visit, moderately severe problem | 46 |
| SHORT | PATRICIA | 99284 | Emergency department visit, problem of high severity | 54 |
| TARPLEY | JIMMY | 99307 | Subsequent nursing facility visit, typically 10 minutes per day | 28 |
| TARPLEY | JIMMY | 99308 | Subsequent nursing facility visit, typically 15 minutes per day | 19 |
| TARPLEY | JIMMY | 99305 | Iinitial nursing facility visit, typically 35 minutes per day | 18 |
| THOMANN | ASHLEY | 99285 | Emergency department visit, problem with significant threat to life or function | 297 |
| THOMANN | ASHLEY | 99284 | Emergency department visit, problem of high severity | 179 |
| THOMANN | ASHLEY | 93010 | Routine electrocardiogram (EKG) using at least 12 leads with interpretation and report | 17 |
| THOMANN | ASHLEY | 99283 | Emergency department visit, moderately severe problem | 55 |
| THOMANN | ASHLEY | 99291 | Critical care delivery critically ill or injured patient, first 30-74 minutes | 17 |
| THORNTON | STACEY | 57282 | Vaginal repair of pelvic ligaments | 12 |
| TRAN | TUNG | 99222 | Initial hospital inpatient care, typically 50 minutes per day | 88 |

| TRAN | TUNG | 43259 | Ultrasound examination of esophagus, stomach, upper small bowel using an endoscope | 30 |
| TRAN | TUNG | 43262 | Incision of pancreatic outlet muscle using an endoscope | 40 |
| TRAN | TUNG | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 419 |
| TRAN | TUNG | 43246 | Insertion of stomach tube using an endoscope | 50 |
| TRAN | TUNG | 45385 | Removal of polyps or growths of large bowel using an endoscope | 92 |
| TRAN | TUNG | 45380 | Biopsy of large bowel using an endoscope | 163 |
| TRAN | TUNG | 99233 | Subsequent hospital inpatient care, typically 35 minutes per day | 592 |
| TRAN | TUNG | 43268 | Insertion of tube or stent into bile or pancreatic duct using an endoscope | 21 |
| TRAN | TUNG | 45378 | Diagnostic examination of large bowel using an endoscope | 111 |
| TRAN | TUNG | 43228 | Destruction of esophageal polyps or growths using an endoscope | 68 |
| TRAN | TUNG | G0121 | Colorectal cancer screening; colonoscopy on individual not meeting criteria for high risk | 15 |
| TRAN | TUNG | 45381 | Injection of large bowel using an endoscope | 23 |
| TRAN | TUNG | 45382 | Control of bleeding in large bowel using an endoscope | 14 |
| TRAN | TUNG | 43269 | Removal of foreign body or change of pancreatic or bile duct tube or stent using an endoscope | 13 |
| TRAN | TUNG | 43271 | Balloon dilation of bile or pancreatic duct using an endoscope | 14 |
| TRAN | TUNG | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 225 |
| TRAN | TUNG | 43264 | Removal of stone from bile or pancreatic duct using an endoscope | 17 |
| TRAN | TUNG | 43255 | Control of bleeding of esophagus, stomach, or upper small bowel using an endoscope | 49 |
| TRAN | TUNG | 43235 | Diagnostic examination of stomach and upper upper small bowel using an endoscope | 40 |
| TRAN | TUNG | 43249 | Balloon dilation of esophagus using an endoscope | 42 |
| TRAN | TUNG | 43239 | Biopsy of the esophagus, stomach, or upper small bowel using an endoscope | 257 |
| TRULY | TED | 99219 | Hospital observation care typically 50 minutes | 24 |
| TRULY | TED | 99222 | Initial hospital inpatient care, typically 50 minutes per day | 91 |
| TRULY | TED | 99231 | Subsequent hospital inpatient care, typically 15 minutes per day | 504 |
| TRULY | TED | 99217 | Hospital observation care discharge | 32 |
| TRULY | TED | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 93 |
| TRULY | TED | 99238 | Hospital discharge day management, 30 minutes or less | 114 |

# EXHIBIT 3b

Exhibit 3b - 2013 TexomaCare Medicare facility claims

| Last Name | First Name | Procedure Code | Description of Procedure | Claims |
|---|---|---|---|---|
| BALCH | BILL | 99222 | Initial hospital inpatient care, typically 50 minutes per day | 34 |
| BALCH | BILL | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 239 |
| BALCH | BILL | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 43 |
| BALCH | BILL | 99233 | Subsequent hospital inpatient care, typically 35 minutes per day | 16 |
| FALCONER | RALPH | 99283 | Emergency department visit, moderately severe problem | 11 |
| FALCONER | RALPH | 99284 | Emergency department visit, problem of high severity | 17 |
| FLAMING | DANIEL | 99233 | Subsequent hospital inpatient care, typically 35 minutes per day | 43 |
| GONZALEZ | IGNACIO | 99217 | Hospital observation care discharge | 19 |
| GONZALEZ | IGNACIO | 99219 | Hospital observation care typically 50 minutes | 19 |
| GONZALEZ | IGNACIO | 99222 | Initial hospital inpatient care, typically 50 minutes per day | 71 |
| GONZALEZ | IGNACIO | 99231 | Subsequent hospital inpatient care, typically 15 minutes per day | 92 |
| GONZALEZ | IGNACIO | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 377 |
| GONZALEZ | IGNACIO | 99238 | Hospital discharge day management, 30 minutes or less | 116 |
| GOODWIN CHAMBERS | SHANNON | 93010 | Routine electrocardiogram (EKG) using at least 12 leads with interpretation and report | 40 |
| GOODWIN CHAMBERS | SHANNON | 99217 | Hospital observation care discharge | 19 |
| GOODWIN CHAMBERS | SHANNON | 99220 | Hospital observation care typically 70 minutes | 14 |
| GOODWIN CHAMBERS | SHANNON | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 68 |
| GOODWIN CHAMBERS | SHANNON | 99231 | Subsequent hospital inpatient care, typically 15 minutes per day | 159 |
| GOODWIN CHAMBERS | SHANNON | 99238 | Hospital discharge day management, 30 minutes or less | 57 |
| GOODWIN CHAMBERS | SHANNON | 99239 | Hospital discharge day management, more than 30 minutes | 25 |
| GOODWIN CHAMBERS | SHANNON | 99308 | Subsequent nursing facility visit, typically 15 minutes per day | 39 |
| HAISLIP | HEIDI | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 39 |
| HAISLIP | HEIDI | 99231 | Subsequent hospital inpatient care, typically 15 minutes per day | 69 |
| HAISLIP | HEIDI | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 38 |
| HAISLIP | HEIDI | 99238 | Hospital discharge day management, 30 minutes or less | 28 |
| KAHL | BRYAN | 79005 | Oral administration of radioactive material therapy agent | 12 |
| KAHL | BRYAN | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 30 |
| NGUYEN | NHAT | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 14 |
| NGUYEN | NHAT | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 94 |
| NGUYEN | NHAT | 99233 | Subsequent hospital inpatient care, typically 35 minutes per day | 19 |
| NGUYEN | NHAT | 99238 | Hospital discharge day management, 30 minutes or less | 13 |
| POTTER | JOE | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 66 |
| POTTER | JOE | 99231 | Subsequent hospital inpatient care, typically 15 minutes per day | 209 |
| POTTER | JOE | 99238 | Hospital discharge day management, 30 minutes or less | 69 |
| POTTER | JOE | 99308 | Subsequent nursing facility visit, typically 15 minutes per day | 69 |
| SALTZ | RICHARD | 43235 | Diagnostic examination of stomach and upper upper small bowel using an endoscope | 41 |
| SALTZ | RICHARD | 43239 | Biopsy of the esophagus, stomach, or upper small bowel using an endoscope | 240 |
| SALTZ | RICHARD | 43246 | Insertion of stomach tube using an endoscope | 12 |
| SALTZ | RICHARD | 43249 | Balloon dilation of esophagus using an endoscope | 21 |
| SALTZ | RICHARD | 43255 | Control of bleeding of esophagus, stomach, or upper small bowel using an endoscope | 28 |
| SALTZ | RICHARD | 45378 | Diagnostic examination of large bowel using an endoscope | 40 |
| SALTZ | RICHARD | 45380 | Biopsy of large bowel using an endoscope | 214 |
| SALTZ | RICHARD | 45381 | Injection of large bowel using an endoscope | 35 |
| SALTZ | RICHARD | 45383 | Removal of growths in large bowel using an endoscope | 14 |

| | | | | |
|---|---|---|---|---|
| SALTZ | RICHARD | 45385 | Removal of polyps or growths of large bowel using an endoscope | 98 |
| SALTZ | RICHARD | 91110 | Administration of oral capsule for evaluation using an endoscope | 25 |
| SALTZ | RICHARD | 99221 | Initial hospital inpatient care, typically 30 minutes per day | 24 |
| SALTZ | RICHARD | 99222 | Initial hospital inpatient care, typically 50 minutes per day | 99 |
| SALTZ | RICHARD | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 82 |
| SALTZ | RICHARD | 99231 | Subsequent hospital inpatient care, typically 15 minutes per day | 111 |
| SALTZ | RICHARD | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 260 |
| SALTZ | RICHARD | 99233 | Subsequent hospital inpatient care, typically 35 minutes per day | 50 |
| SALTZ | RICHARD | G0121 | Colorectal cancer screening; colonoscopy on individual not meeting criteria for high risk | 27 |
| SAUNDERS | JOHN | 99222 | Initial hospital inpatient care, typically 50 minutes per day | 18 |
| SHORT | PATRICIA | 99283 | Emergency department visit, moderately severe problem | 32 |
| SHORT | PATRICIA | 99284 | Emergency department visit, problem of high severity | 47 |
| SHORT | PATRICIA | 99285 | Emergency department visit, problem with significant threat to life or function | 94 |
| SHORT | PATRICIA | 99291 | Critical care delivery critically ill or injured patient, first 30-74 minutes | 15 |
| THOMANN | ASHLEY | 93010 | Routine electrocardiogram (EKG) using at least 12 leads with interpretation and report | 49 |
| THOMANN | ASHLEY | 99283 | Emergency department visit, moderately severe problem | 31 |
| THOMANN | ASHLEY | 99284 | Emergency department visit, problem of high severity | 76 |
| THOMANN | ASHLEY | 99285 | Emergency department visit, problem with significant threat to life or function | 130 |
| THOMANN | ASHLEY | 99291 | Critical care delivery critically ill or injured patient, first 30-74 minutes | 11 |
| TRAN | TUNG | 43228 | Destruction of esophageal polyps or growths using an endoscope | 89 |
| TRAN | TUNG | 43235 | Diagnostic examination of stomach and upper upper small bowel using an endoscope | 46 |
| TRAN | TUNG | 43239 | Biopsy of the esophagus, stomach, or upper small bowel using an endoscope | 313 |
| TRAN | TUNG | 43242 | Ultrasound guided needle aspiration or biopsy of stomach or upper small bowel using an endoscope | 12 |
| TRAN | TUNG | 43246 | Insertion of stomach tube using an endoscope | 32 |
| TRAN | TUNG | 43249 | Balloon dilation of esophagus using an endoscope | 44 |
| TRAN | TUNG | 43251 | Removal of polyps or growths of esophagus, stomach, or upper small bowel using an endoscope | 13 |
| TRAN | TUNG | 43255 | Control of bleeding of esophagus, stomach, or upper small bowel using an endoscope | 55 |
| TRAN | TUNG | 43259 | Ultrasound examination of esophagus, stomach, upper small bowel using an endoscope | 33 |
| TRAN | TUNG | 43262 | Incision of pancreatic outlet muscle using an endoscope | 35 |
| TRAN | TUNG | 43264 | Removal of stone from bile or pancreatic duct using an endoscope | 21 |
| TRAN | TUNG | 43268 | Insertion of tube or stent into bile or pancreatic duct using an endoscope | 29 |
| TRAN | TUNG | 43269 | Removal of foreign body or change of pancreatic or bile duct tube or stent using an endoscope | 23 |
| TRAN | TUNG | 45378 | Diagnostic examination of large bowel using an endoscope | 116 |
| TRAN | TUNG | 45380 | Biopsy of large bowel using an endoscope | 158 |
| TRAN | TUNG | 45381 | Injection of large bowel using an endoscope | 13 |
| TRAN | TUNG | 45382 | Control of bleeding in large bowel using an endoscope | 11 |
| TRAN | TUNG | 45385 | Removal of polyps or growths of large bowel using an endoscope | 103 |
| TRAN | TUNG | 99222 | Initial hospital inpatient care, typically 50 minutes per day | 61 |
| TRAN | TUNG | 99223 | Initial hospital inpatient care, typically 70 minutes per day | 366 |
| TRAN | TUNG | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 226 |
| TRAN | TUNG | 99233 | Subsequent hospital inpatient care, typically 35 minutes per day | 519 |

| | | | | |
|---|---|---|---|---|
| TRAN | TUNG | G0121 | Colorectal cancer screening; colonoscopy on individual not meeting criteria for high risk | 32 |
| TRULY | TED | 99217 | Hospital observation care discharge | 31 |
| TRULY | TED | 99219 | Hospital observation care typically 50 minutes | 25 |
| TRULY | TED | 99222 | Initial hospital inpatient care, typically 50 minutes per day | 116 |
| TRULY | TED | 99231 | Subsequent hospital inpatient care, typically 15 minutes per day | 642 |
| TRULY | TED | 99232 | Subsequent hospital inpatient care, typically 25 minutes per day | 47 |
| TRULY | TED | 99233 | Subsequent hospital inpatient care, typically 35 minutes per day | 25 |
| TRULY | TED | 99238 | Hospital discharge day management, 30 minutes or less | 153 |
| WHITFIELD | LARRY | 99231 | Subsequent hospital inpatient care, typically 15 minutes per day | 59 |